**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| ADAM LEVY, derivatively on behalf of GTT COMMUNICATIONS, INC. <br><br> Plaintiff, <br><br> v. <br><br> RICHARD D. CALDER, JR., CHRIS MCKEE, MICHAEL SICOLI, DANIEL FRASER, H. BRIAN THOMPSON, S. JOSEPH BRUNO, RHODRIC C. HACKMAN, HOWARD E. JANZEN, THEODORE B. SMITH, III, NICK ADAMO, ELIZABETH SATIN, and JULIUS ERVING, <br><br> Defendants, <br><br> and <br><br> GTT COMMUNICATIONS, INC., <br><br> Nominal Defendant. | Civil Action No.:_____ <br><br><br> **DEMAND FOR JURY TRIAL** |

**VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT**

Plaintiff Adam Levy ("Plaintiff"), by and through his undersigned counsel, derivatively on behalf of nominal defendant GTT Communications, Inc. ("GTT" or the "Company"), submits this Verified Stockholder Derivative Complaint against the Individual Defendants (defined herein) as officers and/or directors of GTT for breaches of fiduciary duty, waste of corporate assets, and violations of Section 14(a) of the Securities Exchange Act of 1934 (the "Exchange Act"). Plaintiff bases his allegations on personal knowledge as to his own acts, and on information and belief as to all other allegations, based upon investigation by counsel, including, but not limited to, a review and analysis of: (i) regulatory filings made by GTT with the U.S. Securities and Exchange

Commission (the "SEC"); (ii) press releases issued and disseminated by GTT; (iii) a purported securities class action lawsuits filed in the United Stated District Court for the Eastern District of Virginia, entitled *Plymouth County Retirement System v. GTT Communications, Inc.*, Case 1:19-cv-00982 (E.D.V.A.) (the "Securities Class Action"), alleging violations of the federal securities laws based on similar facts and circumstances as alleged herein; and (iv) other publicly-available information, including media and analyst reports, concerning GTT.

## NATURE OF THE ACTION AND OVERVIEW

1.      This is a stockholder derivative action that seeks to remedy wrongdoing committed from February 26, 2018 through July 1, 2019 (the "Relevant Period") by certain of GTT's officers and members of the Company's Board of Directors (the "Board") and their affiliates.  As alleged herein, Defendants' caused and continue to cause substantial harm to GTT, including monetary damages and injury the Company's reputation and goodwill.

2.      GTT is in the business of providing cloud networking services to large businesses. The Company has historically grown organically as well as through relatively small strategic acquisitions and asset purchases.  In February 2018, however, the Board sanctioned a radical departure from past practice and decided to acquire Interoute Communications Holdings S.A. ("Interoute"), Europe's largest cloud services company, for approximately $2.3 billion.

3.      During the Relevant Period, beginning with the announcement of the Interoute acquisition, GTT represented to investors that its due diligence of Interoute was extensive and thorough and that the acquisition was a natural strategic fit for GTT.  After the acquisition was completed, GTT continued to represent to investors that the integration of GTT and Interoute was progressing as expected.  Despite these representations and assurances, the Interoute acquisition

was detrimental to the Company all along, and the Individual Defendants (defined herein) had been misrepresenting and omitting material facts to investors.

4.      Beginning in May 2019, investors began to learn the true nature of the Interoute acquisition when GTT disclosed disappointing financial results.  The Individual Defendants pointed fingers at various issues, but they disclosed that the integration process was not as smooth as expected previously and that Interoute had made a strategic shift prior to the acquisition that mismatched with GTT's business strategy.  Investors reacted harshly, and the price of GTT stock dropped over 25% in just two days.

5.      Exacerbating the sell-off, analysts began questioning GTT's business model and the Company's disclosures to investors.  After analysts' reports, the price of GTT stock tumbled further, eventually declining more than 65% altogether.

6.      During the Relevant Period, the Individual Defendants made materially false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operations, and prospects.  Specifically, the Individual Defendants failed to disclose to investors that the integration of Interoute was not progressing as:  (i) there were delays in migrating Interoute's legacy systems and processes into GTT's client management database system; (2) Interoute had made a strategic priority shift to sell cloud services that was a higher percentage of Interoute's sales in the two years leading up to the acquisition; (3) a material percentage of the Interoute sales representatives were not productive at selling GTT's core cloud networking services; (4) GTT was unable to yield as many Interoute salespeople because Interoute had hired many sales people focused on cloud services and allowed underperforming sales representatives to remain at Interoute; and (5) as a result of the foregoing, Defendants' public statements were materially false and/or misleading and/or lacked a reasonable basis.

7.      During this time, certain of the Individual Defendants also caused the Company to issue materially false and misleading proxy statements urging stockholders to reelect certain directors under false pretenses. As explained below, in seeking reelection to the Board, the Director Defendants touted their abilities and diligence in carrying out their duties, yet the fact that the Individual Defendants caused the Company to engage in widespread misconduct directly contradicts the assertions contained in GTT's proxy statements.

8.      As a direct and proximate result of the Individual Defendants' breaches of fiduciary duties and other misconduct, GTT has sustained damages as described below.

## JURISDICTION AND VENUE

9.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 14(a) of the Exchange Act (15 U.S.C. § 78n), and SEC Rule 14a-9 (17 C.F.R. § 240.14a-9) promulgated thereunder.

10.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

11.     This Court also has subject matter jurisdiction pursuant to 28 U.S.C. § 1332 because Plaintiff and the Defendants are citizens of different states and the amount in controversy exceeds the sum of value of $75,000, exclusive of interest and costs.

12.     This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

13.     Venue is proper in this District pursuant to 28 U.S.C. §§ 1391 and 1401 because GTT is incorporated in this District. In addition, the Defendants have conducted business in this District, and Defendants' actions have had an effect in this District.

## PARTIES

14.    Plaintiff is a current stockholder of GTT common stock.  Plaintiff has continuously held GTT common stock at least since September 2017. Plaintiff is a citizen of Massachusetts.

15.    Nominal Defendant GTT is a Delaware corporation with its principal executive offices at 7900 Tysons One Place, Suite 1450, McLean, Virginia 22102.  GTT's Common stock shares trade on the New York Stock Exchange ("NYSE") under the ticker symbol "GTT."

16.    Defendant Richard D. Calder ("Calder") has served as the Company's Chief Executive Officer and a director of the Company's Board since May 2007.  Defendant Calder is named as a defendant in the Securities Class Action.  Upon information and belief, defendant Calder is a citizen of Virginia. According to the Company's filings with the SEC, defendant Calder received $9,160,743 from the Company in compensation in 2018.  During the Relevant Period, defendant Calder sold the following shares with insider information regarding GTT's market manipulation, false and misleading statements, and lack of internal controls, all of which resulted in GTT stock trading at artificially inflated prices at the time of his stock sales:

| Date | Shares | Price | Proceeds |
|---|---|---|---|
| March 15, 2018 | 6,000 | $60.01 | $360,074 |
| April 16, 2018 | 6,000 | $49.82 | $298,913 |
| May 15, 2018 | 6,000 | $50.17 | $301,004 |
| June 15, 2018 | 6,000 | $50.32 | $301,928 |
| July 16, 2018 | 6,000 | $46.11 | $276,659 |
| August 16, 2018 | 2,206 | $40.05 | $88,350 |
| February 1, 2019 | 7,545 | $26.32 | $198,578 |
| February 19, 2019 | 1,200 | $29.49 | $35,388 |
| February 21, 2019 | 1,107 | $31.06 | $34,383 |
| February 25, 2019 | 3,234 | $32.43 | $104,879 |
| April 10, 2019 | 1,321 | $39.30 | $51,915 |
| May 3, 2019 | 4,860 | $41.54 | $201,884 |
| May 20, 2019 | 1,757 | $25.43 | $44,681 |
| May 22, 2019 | 1,533 | $26.75 | $41,008 |

| May 28, 2019 | 1,160 | $25.87 | $30,009 |

17.     Defendant Chris McKee ("McKee") has served as the Company's General Counsel and Executive Vice President, Corporate Development, and Corporate Secretary for GTT's Board since 2008.  Defendant McKee is named as a defendant in the Securities Class Action.  Upon information and belief, defendant McKee is a citizen of Virginia. According to the Company's filings with the SEC, defendant McKee received $5,054,882 from the Company in compensation in 2018.  During the Relevant Period, defendant McKee sold the following shares with insider information regarding GTT's market manipulation, false and misleading statements, and lack of internal controls, all of which resulted in GTT stock trading at artificially inflated prices at the time of his stock sales:

| Date | Shares | Price | Proceeds |
|---|---|---|---|
| March 15, 2018 | 7,000 | $60.00 | $420,030 |
| April 16, 2018 | 7,000 | $49.81 | $348,664 |
| May 15, 2018 | 7,000 | $50.15 | $351,062 |
| June 15, 2018 | 7,000 | $50.33 | $352,308 |
| July 16, 2018 | 7,000 | $46.10 | $322,713 |
| August 16, 2018 | 2,211 | $40.05 | $88,551 |
| September 20, 2018 | 7,000 | $45.00 | $315,000 |
| February 1, 2019 | 4,401 | $26.32 | $11,530 |
| February 19, 2019 | 515 | $29.49 | $15,187 |
| February 21, 2019 | 667 | $31.06 | $20,717 |
| February 25, 2019 | 1,720 | $32.43 | $55,780 |
| March 6, 2019 | 3,584 | $32.11 | $115,082 |
| April 10, 2019 | 371 | $39.30 | $14,580 |
| May 3, 2019 | 2,642 | $41.54 | $109,749 |
| May 20, 2019 | 780 | $25.43 | $19,835 |
| May 22, 2019 | 954 | $26.75 | $25,520 |
| May 28, 2019 | 638 | $25.87 | $16,505 |

18.     Defendant Michael Sicoli ("Sicoli") has served as the Company's Chief Financial Officer ("CFO") between April 2015 and September 2019.  The Company abruptly announced on

August 27, 2019 that defendant Sicoli would be resigning on September 30, 2019.  Defendant

Sicoli is named as a defendant in the Securities Class Action.  Upon information and belief,

defendant Sicoli is a citizen of Washington, D.C. According to the Company's filings with the

SEC, defendant Sicoli received $5,051,882 from the Company in compensation in 2018.  During

the Relevant Period, defendant Sicoli sold the following shares with insider information regarding

GTT's market manipulation, false and misleading statements, and lack of internal controls, all of

which resulted in GTT stock trading at artificially inflated prices at the time of his stock sales:

| Date | Shares | Price | Proceeds |
|------|--------|-------|----------|
| February 1, 2019 | 4,857 | $26.32 | $127,832 |
| February 19, 2019 | 570 | $29.49 | $16,809 |
| February 21, 2019 | 531 | $31.06 | $16,493 |
| February 25, 2019 | 1,902 | $32.43 | $61,682 |
| April 15, 2019 | 419 | $40.70 | $17,053 |
| May 3, 2019 | 2,778 | $41.54 | $115,398 |
| May 20, 2019 | 833 | $25.43 | $21,183 |
| May 22, 2019 | 727 | $26.75 | $19,447 |
| May 28, 2019 | 681 | $25.87 | $17,617 |

19.     Defendant Daniel Fraser ("Fraser") has served as the Company's global corporate

controller since April 2014. Upon information and belief, defendant Fraser is a citizen of Virginia.

Defendant Fraser became the Company's CFO after defendant Sicoli resigned in September 2019.

20.     Defendant H. Brian Thompson ("Thompson") has served as Chairman of the

Company's Board since January 2005 and as the Company's Executive Chairman since October

2006.  Defendant Thompson also served as the Company's CEO between January 2005 and

October 2006 and between January 2007 and May 2007.  Upon information and belief, defendant

Thompson is a citizen of Virginia. According to the Company's filings with the SEC, defendant

Thompson received $700,010 from the Company in compensation in 2018.

21.     Defendant S. Joseph Bruno ("Bruno") has served as a director of the Company's Board since 2007.  According to the Company's filings with the SEC, defendant Bruno received $264,000 from the Company in compensation in 2018.  Defendant Bruno served as Chairperson of the Company's Audit Committee during the Relevant Period.  Upon information and belief, defendant Bruno is a citizen of New York. During the Relevant Period, defendant Bruno sold the following shares with insider information regarding GTT's market manipulation, false and misleading statements, and lack of internal controls, all of which resulted in GTT stock trading at artificially inflated prices at the time of his stock sales:

| Date | Shares | Price | Proceeds |
|------|--------|-------|----------|
| March 9, 2018 | 1,000 | $58.15 | $58,150 |
| June 11, 2018 | 1,000 | $49.85 | $49,850 |
| June 12, 2018 | 1,000 | $51.12 | $51,119 |

22.     Defendant Rhodric C. Hackman ("Hackman") has served as a director of the Company's Board since 2005. Upon information and belief, defendant Hackman is a citizen of Florida. According to the Company's filings with the SEC, defendant Hackman received $260,750 from the Company in compensation in 2018.  Defendant Hackman served as a member of the Company's Audit Committee during the Relevant Period.

23.     Defendant Howard E. Janzen ("Janzen") has been a director of the Company's Board since 2006 According to the Company's filings with the SEC, defendant Janzen received $256,500 from the Company in compensation in 2018. Upon information and belief, defendant Janzen is a citizen of Colorado. During the Relevant Period, defendant Janzen sold the following shares with insider information regarding GTT's market manipulation, false and misleading statements, and lack of internal controls, all of which resulted in GTT stock trading at artificially inflated prices at the time of his stock sales:

| Date | Shares | Price | Proceeds |
|------|--------|-------|----------|

| September 7, 2018 | 1,500 | $33.89 | $50,828 |
| October 30, 2018 | 13,000 | $35.82 | $465,639 |
| December 7, 2018 | 1,500 | $39.61 | $59,416 |
| March 7, 2019 | 1,500 | $32.53 | $48,791 |
| June 7, 2019 | 1,500 | $31.67 | $47,506 |

24.     Defendant Theodore B. Smith, III ("Smith") has been a director of the Company's Board since 2007.  Upon information and belief, defendant Smith is a citizen of New York. According to the Company's filings with the SEC, defendant Smith received $263,250 from the Company in compensation in 2018.  Defendant Smith served as a member of the Company's Audit Committee during the Relevant Period.

25.     Defendant Nick Adamo ("Adamo") has been a director of the Company's Board since 2016.  Upon information and belief, defendant Adamo is a citizen of New Jersey.  According to the Company's filings with the SEC, defendant Adamo received $244,750 from the Company in compensation in 2018.

26.     Defendant Elizabeth Satin ("Satin") has been a director of the Company's Board since 2016.  According to the Company's filings with the SEC, defendant Satin received $246,500 from the Company in compensation in 2018.  Upon information and belief, defendant Satin is a citizen of New York.  Defendant Satin served as a member of the Company's Audit Committee during the Relevant Period.

27.     Defendant Julius Erving ("Erving") has been a director of the Company's Board since 2018.  Upon information and belief, defendant Erving is a citizen of Georgia.  According to the Company's filings with the SEC, defendant Bruno received $264,000 from the Company in compensation in 2018.

28.     Defendants Calder, McKee, and Sicoli are sometimes referred to herein as the "Securities Class Action Defendants."

29.     Defendants Calder, Thompson, Bruno, Hackman, Janzen, Smith, Adamo, Satin, and Erving are sometimes referred to herein as the "Director Defendants."

30.     Defendants Calder, McKee, Sicoli, Bruno, and Janzen are sometimes referred to herein as the "Insider Selling Defendants."

31.     Defendants Bruno, Hackman, Smith, and Satin are sometimes referred to herein as the "Audit Committee Defendants."

32.     Defendants Calder, McKee, Sicoli, Fraser, Thompson, Bruno, Hackman, Janzen, Smith, Adamo, Satin, and Erving are sometimes referred to herein as the "Individual Defendants."

## DUTIES OF THE INDIVIDUAL DEFENDANTS

33.     By reason of their positions as officers and/or directors of the Company and because of their ability to control the corporate affairs and business of the Company, the Individual Defendants owed the Company and its stockholders fiduciary obligations of good faith, trust, loyalty, and due care, and were and are required to use their best efforts to control and manage the Company in a fair, just, honest, and equitable manner.  The Individual Defendants were and are required to act in furtherance of the best interests of the Company and its stockholders so as to benefit all stockholders equally and not in furtherance of their personal interest or benefit.  Each director and officer of the Company owes to the Company and its stockholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.

34.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of the Company, were able to and did, directly and indirectly, exercise control over the wrongful acts complained of herein.

35.     In addition, as officers and/or directors of a publicly-held company, the Individual Defendants have a duty to promptly disseminate accurate and truthful information with regard to the Company's operations, performance, management, projections, and forecasts so that the market price of the Company's stock will be based on truthful and accurate information.

36.     To discharge their duties, the officers and directors of GTT were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the Company.  By virtue of such duties, the officers and directors of GTT were required to, among other things:

   a.     ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the SEC and the investing public;

   b.     conduct the affairs of the Company in a lawful, efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

   c.     properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time, including making accurate statements about the Company's financial results and prospects, and ensuring that the Company maintained an adequate system of financial controls such that the Company's financial reporting would be true and accurate at all times;

   d.     remain informed as to how the Company conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiry in connection therewith, and take steps to correct such conditions or practices and make such disclosures as necessary to comply with federal and state securities laws; and

   e.     ensure that the Company was operated in a diligent, honest, and prudent manner in compliance with all applicable federal, state, and local laws, rules and regulations.

37.     Each of the Individual Defendants, as an executive officer and/or director, owed to the Company and to its stockholders the fiduciary duties of loyalty, good faith, and candor in the

management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets.  The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of the Company, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its stockholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company.

38.     According to the Company's Corporate Governance Guidelines, the Director Defendants are "the ultimate decision-making body of the Company and advises and oversees management."  Further, the Corporate Governance Guidelines states that "each director must act in what he or she reasonably believes to be in the best interests of the Company and its stockholders, and must exercise his or her business judgment."

39.     The Company also maintains a Code of Business Conduct and Ethics (the "Code"). The Code sets forth legal and ethical standards of conduct for directors, officers, employees, and consultants of GTT and its subsidiaries.

40.     According to the Code, the employees and directors of GTT are responsible for helping GTT maintain its good reputation and the trust and confidence of its stockholders, its employees, the public, and those with whom GTT does business.

41.     Pursuant to the Code:

Obeying the law, both in letter and in spirit, is the foundation on which the Company's ethical standards are built.  All employees, officers and directors should respect and obey all international, country and local laws, rules, and regulations applicable to the business and operations of the Company.  Although employees, officers and directors may not know all of the details of these laws, rules, and regulations, it is important to know enough to determine what to look for and when to seek advice.

*        *        *

Employees, officers and directors who have access to confidential information relating to the Company are not permitted to use or share that information for stock trading purposes or for any other purpose except the conduct of the Company's business.  All non-public information about the Company should be considered confidential information.  To use non-public information for personal financial benefit or to "tip" others who might make an investment decision on the basis of this information is not only unethical and against Company policy but is also illegal.  Employees, officers and directors also should comply with insider trading standards and procedures adopted by the Company.

*      *      *

The Company requires honest and accurate recording and reporting of information in order to make responsible business decisions.  Information recorded internally or submitted to third parties must be full, fair, accurate, timely, understandable, and complete.  Reports or records should not be used to mislead those who receive them, or to conceal anything that is improper.  Many employees, officers and directors regularly use business expense accounts, which must be documented and recorded accurately.  If an employee, officer or director is not sure whether a certain expense is legitimate, please contact GTT Accounting, who maintains GTT's business expense guidelines.  All of the Company's books, records, accounts, and financial statements must reflect an accurate and verifiable record of all transactions, be maintained in reasonable detail, must appropriately reflect the Company's transactions, and must conform both to applicable legal requirements and to the Company's system of internal controls.  Unrecorded or "off the books" transactions or assets should not be maintained unless permitted by applicable law or regulation.

*      *      *

The Board shall determine, or designate appropriate persons, to determine appropriate actions to be taken in the event of violations of this Code.  Such actions shall be reasonably designed to deter wrongdoing and to promote accountability for adherence to this Code and to these additional procedures, and may include written notices to the individual involved that the Board (or its designee) has determined that there has been a violation, demotion or re-assignment of the individual involved, suspension with or without pay or benefits, and termination of the individual's employment or position.  In determining the appropriate action in a particular case, the Board (or its designee) shall take into account all relevant information, including the nature and severity of the violation, whether the violation was a single occurrence or repeated occurrences, whether the violation appears to have been intentional or inadvertent, whether the individual in question had been advised prior to the violation as to the proper course of action, and whether or not the individual in question had committed other violations in the past.

42.     In addition, the Company's Audit Committee is specifically tasked with the Board's oversight responsibilities.   The conduct of the Audit Committee is governed by the Audit Committee Charter (the "Charter").

43.     Pursuant to the Charter:

The purpose of the Audit Committee (the "Committee") shall be to (1) oversee the accounting and financial reporting processes of the Company and audits of the financial statements of the Company, (2) provide assistance to the Board with respect to its oversight of (a) the integrity of the Company's financial statements, (b) the Company's compliance with legal and regulatory requirements, (c) the independent auditor's qualifications and independence, and (d) the performance of the Company's internal audit function and independent auditor, and (3) prepare the report required by the rules promulgated by the Securities and Exchange Commission (the "SEC") to be included in the Company's annual proxy statement or other SEC filings.

*          *          *

The Committee shall carry out the duties and responsibilities set forth below.  These functions should serve as a guide with the understanding that the Committee may determine to carry out additional functions and adopt additional policies and procedures as may be appropriate in light of changing business, legislative, regulatory, legal, or other conditions.  The Committee shall also carry out any other responsibilities and duties delegated to it by the Board from time to time related to the purposes of the Committee.

In discharging its oversight role, the Committee may, in its sole discretion and without seeking Board approval, engage and obtain advice and assistance from outside accounting, legal and other advisors and shall have the authority to approve the fees payable to such accounting, legal or other advisors and any other terms of retention.  Without limiting the foregoing, the Company shall provide appropriate funding, as determined by the Committee, for payment of (i) compensation to the independent auditor for the purpose of preparing or issuing an audit report or performing other audit, review or attest services for the Company and to any advisors employed by the Committee and (ii) ordinary administrative expenses of the Committee that are necessary or appropriate in carrying out its duties.  Any accounting, legal or other advisor retained by the Committee may, but need not be, in the case of an outside accounting firm, the same accounting firm employed by the Company for the purpose of rendering or issuing an audit. report on the Company's annual financial statements or, in the case of an outside legal or other advisor, otherwise engaged by the Company for any other purpose.

The Committee shall be given full access to the Company's internal auditor, Board, corporate executives, and independent auditor as necessary to carry out its responsibilities.  While acting within the scope of its stated purpose, the Committee shall have all the authority of the Board, except as otherwise limited by applicable law.

Notwithstanding the foregoing, the Committee is not responsible for certifying the Company's financial statements or guaranteeing the independent auditor's report. The fundamental responsibility for the Company's financial statements and disclosures rests with management and the independent auditor.  It also is the job of the Chief Executive Officer and senior management, rather than that of the Committee, to assess and manage the Company's exposure to risk

The Committee shall:

*Documents/Reports Review*

1. Meet with and discuss with management and the independent auditor, prior to public dissemination, the Company's annual audited financial statements and quarterly financial statements, including the Company's disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations," and discuss with the independent auditors the matters required to be discussed by Auditing Standard No. 16.

2. Discuss with management and the independent auditor, prior to the Company's filing of any quarterly or annual report, (a) whether any significant deficiencies in the design or operation of internal control over financial reporting exist that could adversely affect the Company's ability to record, process, summarize, and report financial data; (b) the existence of any material weaknesses in the Company's internal control over financial reporting; and (c) the existence of any fraud, whether or not material, that involves management or other employees who have a significant role in the Company's internal controls over financial reporting.

3. Discuss the Company's earnings press releases (paying particular attention to the use of any "pro forma" or "adjusted" non-GAAP information), as well as financial information and earnings guidance provided to analysts and rating agencies.

4. Discuss the Company's major financial risk exposures, the guidelines and policies by which risk assessment and management is undertaken, and the steps management has taken to monitor and control risk exposure.

*                *                *

*Financial Reporting Process*

12. In consultation with the independent auditor, management, and the internal auditor, review the integrity of the Company's financial reporting processes, both internal and external.  In that connection, the Committee should obtain and discuss with management and the independent auditor reports from management and the independent auditor regarding:

(a) all critical accounting policies and practices to be used by the Company and the related disclosure of those critical accounting policies under "Management's Discussion and Analysis of Financial Condition and Results of Operations";

(b) analyses prepared by management and/or the independent auditor setting forth significant financial reporting issues and judgments made in connection with the preparation of the financial statements, including all alternative treatments of financial information within generally accepted accounting principles that have been discussed with the Company's management, the ramifications of the use of the alternative disclosures and treatments, and the treatment preferred by the independent auditor;

(c) all alternative treatments of financial statements within generally accepted accounting principals that have been discussed with the Company's management, the ramifications of the use of alternative disclosures and treatments, and the treatment preferred by the independent auditor;

(d) major issues regarding accounting principles and financial statement presentations, including any significant changes in the Company's selection or application of accounting principles;

(e) major issues as to the adequacy of the Company's internal controls and any specific audit steps adopted in light of material control deficiencies;

(f) issues with respect to the design and effectiveness of the Company's disclosure controls and procedures, management's evaluation of those controls and procedures, and any issues relating to such controls and procedures during the most recent reporting period;

(g) the effect of regulatory and accounting initiatives, as well as off-balance sheet structures on the financial statements of the Company;

(h) any significant matters arising from any audit, including audit problems and difficulties, whether raised by management, the internal auditor or the independent auditor, relating to the Company's financial statements; and

(i) any other material written communications between the independent auditor and the Company's management, including any "management" letter or schedule of unadjusted differences.

13. Review periodically the effect of regulatory and accounting initiatives, as well as off balance sheet structures, on the financial statements of the Company.

14. Review with the independent auditor any audit problems or difficulties encountered and management's response thereto.  In this regard, the Committee will regularly review with the independent auditor (a) any audit problems or other difficulties encountered by the auditor in the course of the audit work, including any restrictions on the scope of the independent auditor's activities or on access to requested information, and any significant disagreements with management and (b) management's responses to such matters. Without excluding other possibilities, the Committee may review with the independent auditor (i) any accounting adjustments that were noted or proposed by the auditor but were "passed" (as immaterial or otherwise), (ii) any communications between the audit team and the audit firm's national office respecting auditing or accounting issues presented by the engagement, and (iii) any "management" or "internal control" letter issued, or proposed to be issued, by the independent auditor to the Company.

*        *        *

*Legal Compliance/General*

17. Review periodically, with the Company's counsel, any legal matter that could have a significant impact on the Company's financial statements.

*        *        *

*Reports*

23. Prepare all reports of the Committee required to be included in the Company's proxy statement or other SEC filings, pursuant to and in accordance with applicable rules and regulations of the SEC.

24. Report regularly to the full Board following meetings of the Committee (a) with respect to such matters as are relevant to the Committee's discharge of its responsibilities and (b) with respect to such recommendations as the Committee may deem appropriate. In this regard, the Committee will review with the full Board any issues that arise with respect to the quality or integrity of the Company's financial statements, the Company's compliance with legal or regulatory requirements, the performance and independence of the Company's independent auditor, and the performance of the internal audit function. The report to the Board may take the form of an oral report by the Chairman or any other member of the Committee designated by the Committee to make such report.

44.     In violation of the Audit Committee Charter, and their general duties as members of the Audit Committee, the Audit Committee Defendants conducted little, if any, oversight of the Company's internal controls or the Company's compliance with legal and regulatory requirements resulting in materially false and misleading statements regarding the Company's business, operational, and compliance policies, and consciously disregarded their duties to monitor such controls over reporting.  The Audit Committee Defendants' complete failure to perform their duties in good faith resulted in false misrepresentations to the SEC, the investing public, and the Company's stockholders.

45.     In addition, as executive officers and directors of a publicly-traded company whose Common stock was registered with the SEC pursuant to the Exchange Act and traded on the NYSE, the Individual Defendants had a duty not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, including false and misleading information about acquisitions, so that the market price of the Company's common stock would be based upon truthful and accurate information.  Accordingly, the Individual Defendants breached their fiduciary duties by knowingly or recklessly causing GTT to make false and misleading statements of material fact about the Company's financials and about GTT's maintenance of adequate internal controls.

46.     Each of the Individual Defendants further owed to GTT and its stockholders the duty of loyalty requiring that each favor GTT's interest and that of its stockholders over their own while conducting the affairs the Company and refrain from using their position, influence, or knowledge of the affairs of the Company to gain personal advantage.

## SUBSTANTIVE ALLEGATIONS

### *Overview of GTT's Business*

47.     GTT owns and operates a global Tier 1 internet network and provides a comprehensive suite of cloud networking services.  GTT serves national, international and global enterprises, governments, and universities, as well as the world's largest telecoms operators and over the top ("OTT") providers.  GTT also owns a fiber network that includes an expansive pan-European footprint and subsea cables.  According to the Company's public filings, its global network includes over 600 points of presence ("PoPs") spanning six continents, and the Company provides services in more than 140 countries.  According to the Company's filings with the SEC, the Company "serve[s] large enterprise and carrier clients with complex national and global networking needs, and differentiate[s itself] from the competition by providing an outstanding service experience built on [its] core values of simplicity, speed and agility."

48.     Beginning in 2014, GTT began acquiring relatively small companies through a strategy called "tuck-in," in which GTT acquired and consolidated multiple smaller companies to pool their resources, reduce operating costs, and increase revenues.  Indeed, GTT's public filings have historically highlighted the Company's focus on growth through acquisitions:

> We have completed many acquisitions throughout our history, and we believe we have consistently demonstrated an ability to acquire and effectively integrate companies, realize cost synergies, and organically grow revenue post-acquisition. Acquisitions have the ability to increase the scale of our operations, which in turn affords us the ability to expand our operating leverage, extend our network reach, augment our product set, and broaden our customer base.

49.     The Company's acquisition activity over the past several years is as follows:

     a.     On February 19, 2015, GTT entered into a definitive agreement to acquire MegaPath's Managed Services business for $144.9 million in cash and $7.5 million in GTT common stock. MegaPath's Managed Services business

provided private wide-area-networking, Internet access services, managed services and managed security to multinational clients.  As a result of the acquisition, GTT immediately added scale to its customer roster with over 500 new customers.

b.      On October 22, 2015, GTT acquired One Source Networks for $165 million in cash and $10 million in GTT common stock.  One Source Network was a provider of global data, Internet, Session Initiation Protocol ("SIP") trunking, and managed services to Fortune 1000 companies.  As a result of the acquisition, GTT gained three primary benefits: (1) extension of worldwide network reach with new PoP; (2) expansion of its cloud network services, including SIP trunking and other VoIP services; and (3) growth in its multinational customer base and sales force.

c.      On February 9, 2016, GTT acquired Telnes Broadband for $18 million.  By acquiring Telnes Broadband, GTT accelerated its channel capabilities with the addition of strong indirect sales channel with a growing revenue base.

d.      On January 9, 2017, GTT completed the acquisition of Hibernia Networks for $590 million.  As a result of the acquisition, GTT acquired five subsea cables, including Hibernia Express, a low latency transatlantic cable system.

e.      On May _, 2017, GTT purchased IP broker and aggregator Giglinx, for $21 million.  On June 19, GTT announced it was acquiring Perseus Telecom, a provider of low latency services for the financial market industry, for $37.5 million.

f.  On June 26, 2017, GTT announced it was acquiring Massachusetts-based telecommunications provider Global Capacity, for $100 million in cash and 1.85 million shares of GTT common stock.

g.  In January 2018, GTT announced the acquisition of Custom Connect, an Amsterdam-headquartered provider of high-speed network connectivity for multinational enterprises and financial services firms.

h.  In January 2018, GTT announced the acquisition of Custom Connect, an Amsterdam-headquartered provider of high-speed network connectivity for multinational enterprises and financial services firms, for $28.9 million.

## *The Individual Defendants Caused GTT to Issue Materially False and Misleading Statements*

50.   In February 2018, GTT shifted its acquisition strategy and announced the acquisition of Interoute for €1.9 billion ($2.3 billion) in cash.  Prior to the acquisition, Interoute was a privately held telecommunications company that operated Europe's largest cloud services platform.  Following the acquisition, Interoute employed around 2,400 employees, twice the number of employees of GTT prior to the acquisition.

### *The Interoute Acquisition*

51.   On February 26, 2018, GTT issued a press release announcing its acquisition of Interoute for $2.3 billion in cash.  The Individual Defendants touted the acquisition by stating:

The strategic combination:

- Significantly augments scale, expanding GTT's Tier 1 global IP network with one of Europe's most extensive fiber footprints.  The network includes over 400 points of presence, spanning 24 metro areas and interconnecting 126 cities across 29 countries.

- Strengthens GTT's leadership position in software-defined wide area networking (SD-WAN) with expanded capabilities.

- Adds 15 data centers, 17 virtual data centers and 51 colocation facilities, enhancing GTT's cloud connectivity platform.

- Contributes infrastructure, edge and hosted services to GTT's suite of cloud networking services.

- Expands and complements GTT's multinational client base, adding over 1,000 strategic enterprise and carrier clients, primarily headquartered in Europe.

- Enhances GTT's global team with a world-class sales, operations and customer service organization.

52.     Specifically, defendant Calder was quoted in the press release:

The acquisition of Interoute represents a major milestone in delivering on our purpose of connecting people, across organizations and around the world. . . . This combination creates a disruptive market leader with substantial scale, unique network assets and award-winning product capabilities to fulfill our clients' growing demand for distributed cloud networking in Europe, the U.S. and across the globe.   Following our successful, proven acquisition model, we expect to complete this integration within three to four quarters post-close and achieve a post-synergy multiple of seven to eight times Adjusted EBITDA or better on a pro forma basis.

### GTT's 2017 Results and the 2017 10-K

53.     On March 1, 2018, the Individual Defendants caused the Company to file Form 10-K with the SEC (the "2017 10-K"), which made materially false and misleading statements and omitted material information.  As to the Interoute's integration into the Company, GTT stated that:

[GTT's strategy is] based on a number of criteria, including the strategic fit within our existing businesses, the ability to integrate people, systems and networks quickly, and the opportunity to create value through the realization of cost synergies. . . . [The Company has] consistently demonstrated an ability to acquire and effectively integrate companies and realize cost synergies.  Acquisitions have the ability to increase the scale of our operations, which in turn affords us the ability to expand our operating leverage, extend our network reach, augment our product set, and broaden our customer base.

54.     The 2017 10-K included signed certifications by defendants Calder and Sicoli pursuant to Section 906 the Sarbanes-Oxley Act of 2002 ("SOX"), which certified that "[t]he

information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company."

55.     On March 1, 2018, the Individual Defendants issued a press release announcing the Company's financial results for the fourth quarter of 2017, in which defendant Calder stated:

> Our results demonstrate continued execution against our growth strategy" stated Rick Calder, GTT president and chief executive officer. "With the acquisition of Interoute, which we announced earlier this week, we are excited to lead GTT into its next chapter of growth and further enhance our position as the most disruptive player in our industry.

56.     In the press release, defendant Sicoli added that "2017 was an incredible year for GTT, and 2018 is off to a great start. . . . We remain focused on rapid growth and progressing toward our next financial objectives of $2 billion in revenue and $550 million in Adjusted EBITDA."

57.     In connection with the fourth quarter of 2017 results, the Individual Defendants hosted a conference call with analysts and investors.  During the call, defendant Calder discussed the Interoute acquisition and represented that:

> [H]ighly strategic combination significantly augments GTT's scale, expanding our Tier 1 global IP backbone with a robust network. . . . [It] creates a disruptive market leader with substantial scale, unique network assets and award winning product capabilities to fulfill our clients' growing demand for distributed cloud networking services in Europe, the U.S. and across the globe. . . . [Interoute is] very complementary to the strategy that we've employed.  It's sort of a mirror business.

> *     *     *

> One, a strategic fit.  Interoute is a highly complementary platform, essentially the European version of GTT.  We sell the same services to the same type of customers, just in different geographies.  And this gives us the ability to significantly increase our total addressable market and wallet share on both sides of the Atlantic.

> Two, ability to integrate successfully and quickly.  Given how similar our businesses are, we are confident that we can integrate Interoute with GTT within 3 to 4 quarters, which includes an extra quarter or 2 compared to our historical target

integration time frame to account for Interoute's relative size and geographic footprint.

Three, accretive post-synergy price.  Once integration is complete, we expect to achieve a post-synergy purchase price multiple of 7 to 8x adjusted EBITDA, which is highly accretive.  We have tremendous respect for the business that Interoute has built, and we think the value of that business will be enhanced significantly in combination with GTT.

We are eager to build on the success and reputation for exceptional client service that the Interoute team has created and look forward to closing this deal as soon as possible and welcoming Interoute's employees and customers to GTT.

58.     On March 2, 2018, in an interview with *LightReading*, defendant Calder stated that GTT's and Interoute's networks and services "fit together almost hand in glove" and "[i]n terms of integrating it, we want to be measured, make sure we get this right, so instead of our usual one to two quarters to integrate, here we are planning to take three to four quarters, after closing." Defendant Calder explained that the "measured" integration was still "significantly faster than anyone else could do it, but this is our business, we understand it better than anyone else."

*The 1Q2018 10-Q*

59.     On May 4, 2018, the Individual Defendants caused the Company to file a Form 10-Q for 1Q 2018 (the "1Q2018 10-Q"), which stated:

In February 2018, the Company entered into an Agreement for the Sale and Purchase of Interoute Communications Holdings S.A., a Luxembourg public limited liability company (the "Interoute Purchase Agreement").  The purchase price of approximately $2.4 billion will be paid in cash at closing.  The Company has received committed equity financing for the transaction of $425 million from a group of institutional investors and has received committed debt financing from a group of financial institutions in the form of a proposed new credit agreement for the remainder.  In February 2018, the Company also entered into a deal-contingent foreign currency hedge arrangement with a total notional amount of €1.260 billion at a spot rate of $1.23459 to €1.00.  Fees associated with this arrangement are payable upon closing of the acquisition, only if the acquisition closes, and will vary based on the closing date, based on a pre-defined schedule in the hedge agreement.  As of March 31, 2018, the transaction had not closed.  The Company expects the transaction to close during the second quarter of 2018, subject to certain regulatory approvals.

60.     Defendants Calder, Sicoli, and Fraser signed the 1Q2018 10-Q.

61.     On May 3, 2018, related to the first quarter of 2018 results, the Individual Defendants held a conference call with investors and analysts.  During the call, defendant Calder continued to tout the Interoute acquisition by stating that GTT and Interoute were "two incredibly like-minded companies that have similar values, the anti-incumbent values of simplicity, speed, agility."  As to the integration process, defendant Calder stated that:

- "[I] spent most of the last 6 weeks traveling with Gareth Williams, current Interoute CEO, meeting with employees and key customers in every major Interoute office.  I came away with an even deeper level of respect and appreciation for the business, the people and the strategic fit combined with GTT";

- "[I] had a chance to see [] almost twenty different large clients";

- "[I received a] uniform reception from the client base [that] was extremely positive, given the scope and scale of the combined company";

- "[GTT] has made good progress on integration planning since we announced the deal, which should help us proceed quickly with integration upon close across the three dimensions of organization, systems and network";

- "[The deal] will position us to achieve our next financial objectives of $2 billion in revenue and $550 million in adjusted EBITDA"; and

- "[t]alking with the Interoute employees, sales teams and clients," he was "incredibly impressed. It's a fantastic team, deeply tenured in Europe.  To actually try to build that from scratch would take us a decade or more.  So being able to step into an existing, highly performing team across all of the major economies in Europe is just a fantastic combination with us."

*The Cowen TMT Conference*

62.     On May 31, 2018, GTT participated in the Cowen TMT Conference where Sicoli stated that GTT had a "really, really heavy focus on integrating that acquisition" and that there was "heavy hiring going on in our sales organization based on the market opportunity."

63.     At the conference, defendant McKee touted the Interoute acquisition, stating:

[Interoute is really] a European-focused version of GTT [as] their network is predominantly in Western Europe; ours has been U.S. with extensions elsewhere. So it really becomes kind of a hand in glove sort of filling out between Europe and U.S [as] the enterprise customers and the large customers of Interoute are not currently customers of GTT [and] a lot of our customers hadn't been served by Interoute. . . . [The deal will give] great density in both markets . . . [and will] have a field sales force that's great to help you grow organically.

64.     Defendant Sicoli echoed defendant McKee and represented that the combined company will have a "fairly robust sales force, globally, certainly north of 500 on a pro forma basis for the two." As to the integration process, Defendant Sicoli stated:

[I]t's really the end-to-end client experience part. So, it's everything from the coding process, to ordering, to installation, to billing and then trouble ticket management when there is an issue in the network. And that's the homegrown system and we've been refining it over the past couple of decades and got a nice size team now that, it supports that application 24/7 as well. So, the key is all the data is in one place for us from a customer standpoint. Every other company we've bought or looked at doesn't have all of the data in one place like we do and that's a significant advantage for us, not just in terms of providing a good client experience for the customers we have, but it's the thing that enables us to get synergies and get integrations done quickly because our approach is to take all legacy systems from acquired companies and put – take the data out, put it into our CMD system, and shut down all other legacy systems as quickly as possible so that we have one database of record, one set of consistent processes hanging on going forward.

65.     Defendant McKee added that GTT's CMD is "the secret sauce for us" as it is the "only way we really [will] be able to do as much M&A activity and integration activity as we have is that every employee worldwide lives out of the same system in every department…. But what we have is sort of a real-time inventory of what GTT has on behalf of all of the customers, all the suppliers…. And so, that's been – if you really want to get to sort of what's been the secret of how we've grown and how we've been able to do integrations, it's that, it's a complete and total reliance on one back office system for sort of across all departments."

*Completion of Interoute Acquisition*

66.     On May 31, 2018, the Individual Defendants announced the completion of the

Interoute acquisition in a press release.  In the press release, the Individual Defendants touted the

Interoute acquisition, by stating:

> The addition of Interoute: • Significantly augments scale, expanding GTT's Tier 1
> global IP network with one of Europe's most extensive fiber footprints; • Creates
> the most comprehensive and competitive global cloud networking platform in the
> industry; • Adds a large base of marquee multinational clients, balanced across
> geographies and verticals, with very high levels of recurring revenue; • Strengthens
> GTT's leadership in software-defined wide area networking (SD-WAN); and
> • Enhances GTT's global team with a world-class sales, operations and customer
> service organization. GTT expects to complete the integration of Interoute within
> three to four quarters after closing.

67.     Defendant Calder was also quoted in the press release saying that, "The acquisition

of Interoute represents a major milestone in delivering on our purpose of connecting people across

organizations, around the world and to every application in the cloud. . . . Our enhanced scale,

expanded network footprint and award-winning product capabilities reinforce our position as a

global leader in cloud networking.  We look forward to bringing the benefits of this acquisition to

our valued clients across the world."

*The William Blair Growth Stock Conference*

68.     On June 2, 2018, on behalf of GTT, defendant Calder participated in the William

Blair Growth Stock Conference.  During the conference Calder touted the Interoute acquisition

and stated:

> client management database systems and create one database of record for the entire
> business which would occur in early fourth quarter, and that we would integrate the
> two networks together, and they're very non-overlapping, and so the combination
> of the two network assets is very powerful, particularly the deep and diverse fiber
> network footprint they have in the long haul throughout Europe that combines with
> our assets in the Atlantic and in the North and Eastern part of the United States and
> Canada.   And so, we think combination of those network or systems and
> organization we think we'd complete over the first two, three quarters post-close,
> which we did on May 31.

69.     Calder further represented that he had met "with about twenty of the very largest clients of Interoute" and "spent eight of the last ten weeks in Europe" and concluded that Interoute "is very similar to ours in that the Interoute business was about one-third carrier and two-third enterprise" and does "the same thing that we do, providing cloud networking services."  At the end of the conference, Calder represented that GTT felt "very confident in our ability to execute it, particularly having spent really eight of the past ten weeks there and I'll probably spend the bulk of the remainder of this year in Europe basically executing on the integration of the two companies."

### *2Q 2018 Results and 10-Q*

70.     On August 3, 2018, the Individual Defendants reported preliminary financial results for the second quarter of 2018 and held a conference call with investors and analysts.  During the call, defendant Calder stated that "GTT has nearly doubled in size with the most comprehensive and competitive global cloud networking platform in the industry, serving a significantly larger base of marquee multinational clients with a tremendous global team."  Furthermore, defendant Calder represented that GTT's "target selection criteria remains the same, to find opportunities that fit our strategy of providing cloud networking services to large and multinational clients that can be integrated quickly and that can be acquired at highly accretive post-synergy prices" and is "well positioned to succeed … as the disruptor brand in the multi-hundred billion dollar cloud networking services market."

71.     As to the integration itself, Calder represented that GTT was "on track" to "allow the company to operate in one global system with access to the full reach of the network everywhere in the world, all of the Points-of-Presence, all of the network interconnects to our local loop providers everywhere in the world and have one consolidated service platform across the world."  As such, Calder represented that GTT expects "to complete the majority of systems and

network integration by year end as well" and "see the net trend of monthly recurring revenue installations growing into the second half of the year as we complete the integration of both the Interoute and sort of the final legacy integration of the previous deals."  In response to an analyst's question about cross-sell opportunities and sales force, Calder responded:

> [W]e're seeing that interest from both sets of clients, some legacy clients in the U.S. who have deeper reach and opportunity in Europe.  And clearly, the Interoute clients who are very interested in getting quotations and delivery for services into the Americas.  So [] the key focus on the cross-sell is to get the systems integrated, and then we think that we'll see real upside opportunity in terms of productivity and sales, even above the records levels that we've been at today.  In terms of depth of services, to your other question, generally we sell the same thing.  So we think 95% of what Interoute did was exactly what we did.  There's a little bit of overlap in cloud services or additional business.  It's sold to some really great marquee clients, and we want to continue to grow that part of the advanced solutions business.  So we see some opportunity to cross-sell and upsell there.  However, we think the core business that we're in, cloud networking services, is very similar across the two platforms, which is why we thought it was a fantastic deal for us.

72.    Defendant Calder continued, stating that GTT is "inheriting a significant team from Interoute and is in the process of integrating them into the GTT way" and have "told the whole Interoute team prior to the CMD cutover on October 1, business as usual."  As to the productivity of the combined company, defendant Calder noted that GTT is "seeing great productivity on both sides - so legacy GTT, legacy Interoute.  And so our goal is to continue to drive that productivity up as we continue to hire.  I mean, we are absolutely continuing to hire quota-bearing reps across all geographies at this stage as we look to drive ever-increasing levels of rep-driven growth."

73.    Defendant Calder also projected that GTT's objective "is to have double-digit growth with the combination of rep-driven and small M&A which we view as sort of organic part of our business as we buy books of business."

### The Oppenheimer Technology, Internet & Communications Conference

74.    On August 7, 2018, on behalf of the Company, defendant McKee participated in the Oppenheimer Technology, Internet & Communications Conference.  In response to a question

about how much due diligence GTT had done in the last six months, defendant McKee represented

that GTT "had good information on Interoute at the time we did that because we had done a lot of

diligence on it."  Defendant McKee further represented that GTT knows "a lot more now than we

knew then and we're more confident than we were then" and "in terms of facts on the ground, they

haven't changed or as we've learned more, it's just reinforced our opinion and our optimism about

being able to get every single number that we forecast and then some."

### *The KeyBanc Capital Markets Technology Leadership Forum*

75.    On August 13, 2018, on behalf of the Company, defendant McKee participated in

the KeyBanc Capital Markets Technology Leadership Forum where McKee represented that the

"complexity of Interoute business is actually not as much as – not as complex as many business

we've integrated.  So, we have high confidence.  When you look at Interoute, the thing we keep

coming back to is, it's a European version of GTT.  It really just looks just like us, with sort of

easy mapping between, this is the service that they do that maps nicely to a service that GTT does

or this customer base sort of fits hand in glove with that."

### *3Q2018 Results and 10-Q*

76.    On November 8, 2018, the Individual Defendants caused the Company to file a

Form 10-Q (the "3Q2018 10-Q") announcing the Company's third quarter of 2018 operating

results.  In the 3Q2018 10-Q, the Individual Defendants stated:

> In February 2018, the Company entered into an Agreement for the Sale and
> Purchase of Interoute Communications Holdings S.A., a Luxembourg public
> limited company (the "Interoute Purchase Agreement").  The purchase
> price of approximately $2.4 billion will be paid in cash at closing.  The Company
> has received committed equity financing for the transaction of $425 million from a
> group of institutional investors and has received committed debt financing from a
> group of financial institutions in the form of a proposed new credit agreement for
> the remainder.  In February 2018, the Company also entered into a deal-contingent
> foreign currency hedge arrangement with a total notional amount of €1.260
> billion at a spot rate of $1.23459 to €1.00.  Fees associated with this arrangement
> are payable upon closing of the acquisition, only if the acquisition closes, and will

vary based on the closing date, based on a pre-defined schedule in the hedge agreement.  As of March 31, 2018, the transaction had not closed.  The Company expects the transaction to close during the second quarter of 2018, subject to certain regulatory approvals.

77.     Defendants Calder, Sicoli, and Fraser signed the 3Q2018 10-Q.

78.     In a related earnings call with investors and analysts held on November 8, 2018, defendant Calder stated:

> Given our successful progress on Interoute integration, right after the quarter ended, we announced the acquisition of Access Point. . . . [GTT made meaningful progress on the integration of our largest strategic acquisition, Interoute. . . . [Interoute] is now on a growth path moving forward.
>
> *       *       *
>
> We completed the organization integration in September and we expect the majority of those employees currently on transition to leave the company by yearend with the remainder leaving throughout the first half of 2019.  The systems integration is also well underway as we consolidated all core business support systems to our Client Management Database, CMD, in October.   Network integration is also on track for substantial completion in the next few months.
>
> *       *       *
>
> [There is] a whole series of very tenured salesforce from the Interoute acquisition into the UK and Europe divisions, we think really allow us to start, continue that productivity growth. . . . [W]e'll continue to grow and mature the salesforce that we have, but we felt very comfortable.  That's one of the strategic benefits we got from the Interoute acquisition, is having a very balanced salesforce. . . . [GTT has] actually completed now the integration of Interoute and taken folks that were – and decided who's quota-bearing, who's staying within the organization – and the majority of the performing quota-bearing organization is now with us.

*The UBS Global Media and Communications Conference*

79.     On December 4, 2018, on behalf of the Company, defendants Calder and Sicoli participated in the UBS Global Media and Communications Conference.  At the conference, defendant Calder stated that GTT's acquisition strategy focuses on companies that "have to be strategic when we buy them, meaning they have to do exactly what I said, fulfilling our purpose of helping connect people, providing cloud networking services to large multinational clients and

really focused on that networking element" and do "exactly what we do and are not far afield from us." Defendant Calder continued:

> We generally think about our business in quarters first and foremost because we're buying businesses that are strategic and that are doing exactly what we do and are not far afield from us; second, we look in diligence as to whether we can integrate it into what we call our client management database, and eliminate all of the other business support systems and the operating systems that exist in the acquired firm. And it is critically important to us that we run our business on one database of record. There are even the businesses we buy sometimes have not integrated completely. Interoute was one of those where [it] had not completely integrated across three different customer relationship management systems or business support systems, and we just now completed the complete integration of Interoute onto GTT's business[.]

*     *     *

> the first and foremost proof point of the integration is the fact that we had started our acquisitions again. So, had we not felt really comfortable with where we stood with Interoute, we would not have done the Access Point integration.

*     *     *

> Exactly, we have made all of the organizational integration and have been very clear with the entire organization about who is part of the go forward, who is on transition as we put one company together with one organizational structure across all of our offices throughout the world. Two, we've completed, … all of the integration into our core Client Management Database and that is effectively complete, a little bit of cleanup activity as we continue to go but are starting the first billing out of our system and not out of any of the legacy systems.

80.    Defendant Sicoli added that GTT targets companies where they are "easy to integrate within a couple of quarters and then highly accretive." Even though Interoute "was a significantly larger transaction," Sicoli represented that "there really wasn't anything new that we found when we went through the integration" and "there were no new issues compared to what we've seen before, which is why it's not a surprise that it's on track."

*2018 Results and the 10-K*

81.    On February 28, 2019, the Individual Defendants held an earnings call with investors and analysts to discuss the Company's fourth quarter and year end results for 2018.

During the call, defendant Calder continued to affirm that Interoute integration was on-track, by stating:

> [I]ntegration of Interoute is on track. . . . Organization integration was completed back in September and most of the employees – associated employee reductions are now done.  Systems integration is nearly complete with all ordering, installation, billing and financial transactions now in GTT systems. . . . [N]etwork integration is also on track as the core network has been consolidated and point of presence consolidation is well underway.

82.     Defendant Sicoli added that "nothing's really changed from the way we thought about it previously which is that we expect to be done with the integration by the end of the second quarter."

83.     On March 1, 2019, the Individual Defendants caused the Company to file a Form 10-K (the "2018 10-K") which made materially false and misleading statements and omitted material information.  As to the Interoute's integration into the Company, GTT stated that:

> [GTT's integration strategy is] based on a number of criteria, including the strategic fit within our existing businesses, the ability to integrate people, systems and networks quickly, and the opportunity to create value through the realization of cost synergies. . . . [GTT has] consistently demonstrated an ability to acquire and effectively integrate companies and realize cost synergies.  Acquisitions have the ability to increase the scale of our operations, which in turn affords us the ability to expand our operating leverage, extend our network reach, augment our product set, and broaden our customer base. . . . [The] integration efforts are designed to establish scale and align Interoute's network assets and product offerings within our existing business.

84.     The 2018 10-K included signed certifications by defendants Calder and Sicoli pursuant to Section 906 the Sarbanes-Oxley Act of 2002 ("SOX"), which certified that "[t]he information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company."

*The Raymond James Institutional Investors Conference*

85.     On March 4, 2019, on behalf of the Company, defendant Fraser participated in the

Raymond James Institutional Investors Conference.   At the conference defendant Fraser touted

that the Interoute acquisition "was a transformative deal for GTT" and stated:

> [T]the first question is does this company add a strategic fit to the company,
> meaning does it expand our network, does it give us great customers that we didn't
> have, or does it give us a capability that we don't have….The second question is
> that we must be able to integrate the company within a very short period of time.

> \*         \*         \*

> And that short period of time that we define it as two quarters.  And so we actually
> as a management team have a visceral reaction to a lot of people who view us as a
> roll-up shop because we're anything but that.   We integrate every acquisition that
> we buy and we make sure that it's even on the list that we must be able to actually
> integrate it.  And then the third thing, and probably most important from a numbers
> perspective, is that the acquisition must be accretive both from a revenue and on
> EBITDA basis.

> \*         \*         \*

> So, we have an internally developed system called CMD and it's unique to us
> because it is the single database of record for both our vendor and our customer and
> we actually have the ability to tie the two together and so we can tell at the circuit
> level whether we have a profitable circuit or not.  And so what we strive to do is
> we take all the data from the old or the acquired systems and we push it into CMD
> within one quarter, sometimes maybe four or five months.  And we bill out of CMD.
> We have a database of vendors that we bump up against our payment records, so
> it's critical to actually making sure we have all the synergies in play by making sure
> that they're in the systems quickly.

> \*         \*         \*

> [GTT has] almost a maniacal religious view to integration and it just started simply
> as billing and we want all of our customers to have a single invoice or a single bill
> coming from our system . . . [that is] truly . . . one system, one invoice and one team
> of people that – to really look after that customer.

> \*         \*         \*

> [The Interoute acquisition] was absolutely a strategic fit for us.  Not only did it
> expand our network into Europe, but it brought to us a number of high profile, high
> quality customers. . . . It was clearly accretive to revenue and EBITDA at close to

€800 million in revenue and are now on a post-synergy basis it'll probably be right at the seven times. . . . [GTT is] very encouraged by the sales team and their willingness and they really want – the one thing Interoute did historically over the last four years or five years is actually turned down customers in Europe that wanted to buy U.S. connectivity and now we're being approached by some of Interoute's largest clients….So we're incredibly bullish about Interoute right now and the integration has gone really well.

86.     The above statements in ¶¶ 50-85 were materially false and/or misleading when they were made and failed to disclose material adverse facts about the Company's business operations, and prospects.  Specifically, the Individual Defendants failed to disclose to investors that the integration of Interoute was not progressing as:  (i) there were delays in migrating Interoute's legacy systems and processes into GTT's client management database system; (2) Interoute had made a strategic priority shift to sell cloud services that was a higher percentage of Interoute's sales in the two years leading up to the acquisition; (3) a material percentage of the Interoute sales representatives were not productive at selling GTT's core cloud networking services; (4) GTT was unable to yield as many Interoute salespeople because Interoute had hired many sales people focused on cloud services and allowed underperforming sales representatives to remain at Interoute; and (5) as a result of the foregoing, Defendants' public statements were materially false and/or misleading and/or lacked a reasonable basis.

## *The Truth Is Revealed*

87.     On May 8, 2019, the Individual Defendants announced GTT's disappointing financial results for the first quarter of 2019 and reported $450.2 million in revenue and $27.3 million in net loss.  In connection with the announcement of the first quarter of 2019 financial results, the Individual Defendants held a conference call with investors and analysts.

88.     During the conference call, defendant Calder disclosed that GTT's "rapid integration strategy is challenging for employees, clients and suppliers, and Interoute was no exception."  Specifically, defendant Calder disclosed that revenue "declined 1% sequentially as

our pace of installs was a little slower than expected due to some delays related to integration activities and training as we migrated Interoute's legacy systems and processes into GTT's single client management database system" in December 2018.  The migration of Interoute's legacy systems and processes                     into GTT's CMD had caused a "slowdown" in the integration of Interoute.

89.     Defendant Sicoli also revealed that the first quarter ended with a cash balance and net cash provided by operating activities of $51 million and $16 million, respectively, as they were "negatively impacted by a significant use of working capital related to Interoute accounts receivable, as we transitioned billing and collections activity into our CMD system.  This resulted in some invoice delivery delays and slower payments as our clients review and validate the new billing format."

90.     Defendant Calder continued to explain that the "combined GTT is keenly focused on our strategy of selling cloud networking services to large and multinational clients" and "ha[s] deemphasized nonstrategic products that are tangential to our strategy."  Specifically, defendant Calder disclosed that GTT is "very focused on providing cloud networking services to large multinational clients," and not focused "on growing the cloud services" and "selling new cloud services, new hosting, new computer services and that has been a real shift with respect to legacy Interoute and the trajectory they have been on."  Significantly, defendant Calder revealed that Interoute had a "much higher percentage of their sales in the year or two leading up to the acquisition," and was focused on cloud services "because Interoute had made a strategic priority shift that we did not maintain."

91.     On this news, the price of GTT's stock declined 18% to $33.25 the same day.  On May 9, 2019, the price of GTT's stock continued to decline another $3.34 per share, closing at $29.91 per share.

92.     Several analysts covering GTT were surprised by the myriad issues disclosed and immediately downgraded GTT.  For example, BTIG noted that "the more than 1% sequential decline in revenue this quarter was disappointing given the optimistic comments made by management over the past three quarters."   Cowen attributed GTT's revenue shortfall to integration issues related to the transitioning of Interoute's legacy systems onto GTT's single platform "as employees (especially in Europe) had to be trained on the new system, which inevitably caused a slowdown in installations/provisioning and consequently had a negative impact on revenue during the quarter."

93.     On May 30, 2019, on behalf of the Company, defendants McKee and Sicoli participated in the Cowen TMT Conference.  At the conference, defendant McKee disclosed that the Interoute integration was "challenging … as we moved thousands of Interoute employees off of the Interoute systems and off of how they sold, installed, billed and moved everything into GTT systems there [were] some delays as we both went to render a new bill to the customers who are going to be getting a GTT bill instead of an Interoute bill."

94.     At the conference, defendant Sicoli added that it "didn't yield quite as many salespeople at the end of that process on the Interoute side as we initially thought" because Interoute "had hired a lot more people focused on cloud services" and did not terminate the "bottom 10% of their sales teams."   Defendant Sicoli explained that the "big issue is our sales force was too small in the second half of last year.  We didn't necessarily intend to slow hiring, but naturally when you're going through a large integration and you know going through that

organizational process and terminating a lot of employees, you kind of naturally slow down hiring."

95.     On this news, the price of GTT's stock fell 5% to $23.78 per share the next day on May 31, 2019.

96.     On June 24, 2019, analysts at Craig-Hallum reduced their price target on GTT because "the company is in the midst of altering its DNA, which had been largely built of growth via acquisitions, a process that has been challenged by debt levels and recent integration issues." Craig-Hallum noted that instead of continuing its roll-up strategy, GTT is now trying to "rebuild its organic growth platform" by hiring a new salesforce.  GTT's stock price fell in response to the news.  On June 24, 2019, GTT's stock price dropped another $2.87 per share, or 14%, to close at $19.97 per share.

97.     Likewise, on July 2, 2019, KeyBanc downgraded GTT and highlighted how internal data on GTT suggested hiring activity remained slow, indicating the increase in employee representatives necessary to achieve revenue targets might be lower than expected. KeyBanc also reported on recent leadership changes in the Americas division, noting that they were "an indication that organizational health is not great."

98.     On this news, the price of GTT's stock fell 3% to $18.30 per share on the same day on July 2, 2019.

### *The Director Defendants Issued a Materially False and Misleading Proxy Statement During the Relevant Period.*

99.     In addition to the above false and misleading statements issued and/or caused to be issued by the Individual Defendants, the Director Defendants also caused the Company to issue a false and misleading proxy statement during the Relevant Period.  The Director Defendants drafted, approved, reviewed, and/or signed two Forms DEF14A before they were filed with the

SEC and disseminated to GTT's stockholders on April 30, 2018 (the "2018 Proxy") and April 26, 2019 (the "2019 Proxy"). The Director Defendants negligently issued materially misleading statements in the 2018 Proxy and the 2019 Proxy. These proxy allegations are based solely on negligence, they are not based on any allegations of recklessness or knowing conduct by or on behalf of the Individual Defendants, and they do not allege and do not sound in fraud. Plaintiff specifically disclaims any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to the proxy allegations and related claims.

100. The 2018 Proxy sought stockholder votes to, among others, elect defendants Calder, Thompson, Bruno, Hackman, Janzen, Smith, Adamo, Satin, and Erving for a one-year term.

101. In support the Director Defendants' bid to reelect defendants Calder, Thompson, Bruno, Hackman, Janzen, Smith, Adamo, Satin, and Erving, the Director Defendants highlighted their supposed oversight of the Company. In particular, the 2018 Proxy assured stockholders that the Board and its committees regularly assess and manage the risks that GTT faces, including legal and regulatory risks, financial controls, and risks associated with compensation programs and plans. The 2018 Proxy stated:

### The Audit Committee

The role of the Audit Committee is (1) to oversee the accounting and financial and reporting processes of our Company and the audits of the financial statements of our Company, (2) to provide assistance to our Board of Directors with respect to its oversight of the integrity of the financial statements of our Company, our Company's compliance with legal and regulatory requirements, the independent registered public accounting firm's qualifications and independence, and the performance of our Company's internal audit function, and independent registered public accounting firm, and (3) to prepare the report of the Audit Committee required by the rules promulgated by the SEC to be included in the Company's annual proxy statement or other SEC filings. The primary responsibilities of the Audit Committee are set forth in its charter and include various matters with respect to the oversight of our Company's accounting and financial reporting process and

audits of the financial statements of our Company on behalf of our Board of Directors. The Audit Committee also selects the independent registered public accounting firm to conduct the annual audit of the financial statements of our Company; reviews the proposed scope of such audit; reviews accounting and financial controls of our Company with our financial accounting staff; and, unless otherwise delegated by our Board of Directors to another committee, reviews and approves transactions, if any, between us and our directors, officers, and their affiliates.

The Audit Committee currently consists of Messrs. Bruno, Smith and Hackman and Ms. Satin, each of whom is an independent director of our Company under the New York Stock Exchange, or "NYSE," Marketplace Rules and under rules adopted by the SEC pursuant to the Sarbanes-Oxley Act of 2002. The Board of Directors previously determined that all members of the Audit Committee meet the requirements for financial literacy and that Mr. Bruno qualifies as an "audit committee financial expert" in accordance with applicable rules and regulations of the SEC. Mr. Bruno serves as the Chairman of the Audit Committee.

*     *     *

**Role of the Board of Directors in Risk Oversight**

The Board of Directors has an active role in overseeing our risk management. In this regard, the Board of Directors regularly reviews and discusses information presented by management regarding our business and operations risks, including information and risks related to our long-term business strategy, actual and planned financial position and operational performance, industry trends and their potential impact on us, our competitive positioning, potential acquisitions and divestitures, our technology and market direction and regulatory and compliance matters, among others. The Board of Directors also reviews and approves corporate goals and budgets on an annual basis. While the Board of Directors has the ultimate oversight responsibility for the risk management process, various committees of the Board also have responsibility for risk management, as described below. Senior management regularly reports to the Board or the appropriate committee of the Board on areas of material risk to our Company, which may include financial, legal and regulatory risks, and operational and strategic risks.

The Audit Committee oversees management of financial risks, including but not limited to accounting matters, tax positions, insurance coverage, interest rate and foreign exchange risk, and security of our Company's cash reserves. In particular, the Audit Committee focuses on financial risk, including any risk related to our internal controls, and receives an annual risk assessment review from our Company's internal auditors. The Audit Committee discusses with management major financial risk exposures, including data security risks, and the steps management has taken to monitor and control such exposures, including our risk assessment and risk management policies.

*       *       *

## REPORT OF THE AUDIT COMMITTEE

The Audit Committee oversees our Company's accounting and financial reporting processes and the audits of its financial statements, including the performance and compensation of our Company's independent auditor. Management has the primary responsibility for the financial statements and the reporting process, including the systems of internal controls and the certification of the integrity and reliability of our Company's internal controls procedures.

In fulfilling its oversight responsibilities, the Audit Committee has reviewed and discussed our Company's financial statements for the years ended December 31, 2017 and 2016 and our Company's Sarbanes-Oxley compliance plan with our Company's management. The Audit Committee also reviewed with CohnReznick LLP, our Company's independent registered public accounting firm, the results of their audit. The Audit Committee has also discussed with the independent registered public accounting firm the matters required to be discussed by the Statement on Auditing Standards No. 1301, as amended, as adopted by the Public Company Accounting Oversight Board in Rule 3200T. This discussion included, among other things, the quality of our Company's accounting principles, the reasonableness of significant estimates and judgments, and the clarity of disclosure in our Company's financial statements, including the disclosures related to critical accounting policies and practices used by our Company. The Audit Committee has reviewed permitted services under the rules of the SEC as currently in effect and discussed with CohnReznick LLP their independence from management and our Company, including the matters in the written disclosures and the letter from the independent registered public accounting firm required by the Public Company Accounting Oversight Board in Rule 3526 Communication with Audit Committees, and has considered and discussed the compatibility of non-audit services provided by CohnReznick LLP with that firm's independence. In addition, the Audit Committee discussed the rules of the SEC that pertain to the Audit Committee and the roles and responsibilities of Audit Committee members.

Based on its review of the financial statements and the aforementioned discussions, the Audit Committee concluded that it would be reasonable to recommend, and on that basis did recommend, to the Board of Directors that the audited financial statements be included in our Company's annual report on Form 10-K for the year ended December 31, 2017.

102.    The 2018 Proxy, thus, assured stockholders that both the Individual Defendants and the Board was involved with GTT's business strategy, actively monitored the Company's risks and exposures, following good corporate governance practices and acting in an ethical and legal

manner.   In reality, the Director Defendants were utterly failing in their oversight duties by allowing the Company to operate with inadequate internal controls which resulted in the failure disclose to investors that the integration of Interoute was not progressing as:  (i) there were delays in migrating Interoute's legacy systems and processes into GTT's client management database system; (2) Interoute had made a strategic priority shift to sell cloud services that was a higher percentage of Interoute's sales in the two years leading up to the acquisition; (3) a material percentage of the Interoute sales representatives were not productive at selling GTT's core cloud networking services; (4) GTT was unable to yield as many Interoute salespeople because Interoute had hired many sales people focused on cloud services and allowed underperforming sales representatives to remain at Interoute; and (5) as a result of the foregoing, Defendants' public statements were materially false and/or misleading and/or lacked a reasonable basis.

103.    As a result of these misleading statements, the Company's stockholders voted via an uninformed stockholder vote to reelect defendants Calder, Thompson, Bruno, Hackman, Janzen, Smith, Adamo, Satin, and Erving.

104.    The 2019 Proxy sought stockholder votes to, among others, elect defendants Calder, Thompson, Bruno, Hackman, Janzen, Smith, Adamo, Satin, and Erving and non-defendant Benjamin Stein ("Stein") for a one-year term.

105.    In support the Director Defendants' bid to elect defendants Calder, Thompson, Bruno, Hackman, Janzen, Smith, Adamo, Satin, and Erving and non-defendant Stein, the Director Defendants highlighted their supposed oversight of the Company. In particular, the 2019 Proxy assured stockholders that the Board and its committees regularly assess and manage the risks that GTT faces, including legal and regulatory risks, financial controls, and risks associated with compensation programs and plans. The 2019 Proxy stated:

### *The Audit Committee*

The role of the Audit Committee is (1) to oversee the accounting and financial and reporting processes of our Company and the audits of the financial statements of our Company, (2) to provide assistance to our Board of Directors with respect to its oversight of the integrity of the financial statements of our Company, our Company's compliance with legal and regulatory requirements, the independent registered public accounting firm's qualifications and independence, and the performance of our Company's internal audit function, and independent registered public accounting firm, and (3) to prepare the report of the Audit Committee required by the rules promulgated by the SEC to be included in the Company's annual proxy statement or other SEC filings. The primary responsibilities of the Audit Committee are set forth in its charter and include various matters with respect to the oversight of our Company's accounting and financial reporting process and audits of the financial statements of our Company on behalf of our Board of Directors. The Audit Committee also selects the independent registered public accounting firm to conduct the annual audit of the financial statements of our Company; reviews the proposed scope of such audit; reviews accounting and financial controls of our Company with our financial accounting staff; and, unless otherwise delegated by our Board of Directors to another committee, reviews and approves transactions, if any, between us and our directors, officers, and their affiliates.

The Audit Committee currently consists of Messrs. Bruno, Smith and Hackman and Ms. Satin, each of whom is an independent director of our Company under the New York Stock Exchange, or "NYSE," Marketplace Rules and under rules adopted by the SEC pursuant to the Sarbanes-Oxley Act of 2002. The Board of Directors previously determined that all members of the Audit Committee meet the requirements for financial literacy and that Mr. Bruno qualifies as an "audit committee financial expert" in accordance with applicable rules and regulations of the SEC. Mr. Bruno serves as the Chairman of the Audit Committee.

*        *        *

### Role of the Board of Directors in Risk Oversight

The Board of Directors has an active role in overseeing our risk management. In this regard, the Board of Directors regularly reviews and discusses information presented by management regarding our business and operations risks, including information and risks related to our long-term business strategy, actual and planned financial position and operational performance, industry trends and their potential impact on us, our competitive positioning, potential acquisitions and divestitures, our technology and market direction and regulatory and compliance matters, among others. The Board of Directors also reviews and approves corporate goals and budgets on an annual basis. While the Board of Directors has the ultimate oversight responsibility for the risk management process, various committees of the Board

also have responsibility for risk management, as described below. Senior management regularly reports to the Board or the appropriate committee of the Board on areas of material risk to our Company, which may include financial, legal and regulatory risks, and operational and strategic risks.

The Audit Committee oversees management of financial risks, including but not limited to accounting matters, tax positions, insurance coverage, interest rate and foreign exchange risk, and security of our Company's cash reserves. In particular, the Audit Committee focuses on financial risk, including any risk related to our internal controls, and receives an annual risk assessment review from our Company's internal auditors. The Audit Committee discusses with management major financial risk exposures, including data security risks, and the steps management has taken to monitor and control such exposures, including our risk assessment and risk management policies.

*　　*　　*

## REPORT OF THE AUDIT COMMITTEE

The Audit Committee oversees our Company's accounting and financial reporting processes and the audits of its financial statements, including the performance and compensation of our Company's independent auditor. Management has the primary responsibility for the financial statements and the reporting process, including the systems of internal controls and the certification of the integrity and reliability of our Company's internal controls procedures.

In fulfilling its oversight responsibilities, the Audit Committee has reviewed and discussed our Company's financial statements for the years ended December 31, 2018 and 2017 and our Company's Sarbanes-Oxley compliance plan with our Company's management. The Audit Committee also reviewed with CohnReznick LLP, our Company's independent registered public accounting firm, the results of their audit. The Audit Committee has also discussed with the independent registered public accounting firm the matters required to be discussed by the Statement on Auditing Standards No. 1301, as amended, as adopted by the Public Company Accounting Oversight Board in Rule 3200T. This discussion included, among other things, the quality of our Company's accounting principles, the reasonableness of significant estimates and judgments, and the clarity of disclosure in our Company's financial statements, including the disclosures related to critical accounting policies and practices used by our Company. The Audit Committee has reviewed permitted services under the rules of the SEC as currently in effect and discussed with CohnReznick LLP their independence from management and our Company, including the matters in the written disclosures and the letter from the independent registered public accounting firm required by the Public Company Accounting Oversight Board in Rule 3526 Communication with Audit Committees, and has considered and discussed the compatibility of non-audit services provided by CohnReznick LLP with that firm's independence. In addition, the Audit

Committee discussed the rules of the SEC that pertain to the Audit Committee and the roles and responsibilities of Audit Committee members.

Based on its review of the financial statements and the aforementioned discussions, the Audit Committee concluded that it would be reasonable to recommend, and on that basis did recommend, to the Board of Directors that the audited financial statements be included in our Company's annual report on Form 10-K for the year ended December 31, 2018.

106.    The 2019 Proxy, thus, assured stockholders that both the Individual Defendants and the Board was involved with GTT's business strategy, actively monitored the Company's risks and exposures, following good corporate governance practices and acting in an ethical and legal manner.   In reality, the Director Defendants were utterly failing in their oversight duties by allowing the Company to operate with inadequate internal controls which resulted in the failure disclose to investors that the integration of Interoute was not progressing as:  (i) there were delays in migrating Interoute's legacy systems and processes into GTT's client management database system; (2) Interoute had made a strategic priority shift to sell cloud services that was a higher percentage of Interoute's sales in the two years leading up to the acquisition; (3) a material percentage of the Interoute sales representatives were not productive at selling GTT's core cloud networking services; (4) GTT was unable to yield as many Interoute salespeople because Interoute had hired many sales people focused on cloud services and allowed underperforming sales representatives to remain at Interoute; and (5) as a result of the foregoing, Defendants' public statements were materially false and/or misleading and/or lacked a reasonable basis.

107.    As a result of these misleading statements, the Company's stockholders voted via an uninformed stockholder vote to elect defendants Calder, Thompson, Bruno, Hackman, Janzen, Smith, Adamo, Satin, and Erving and non-defendant Stein.

***The Insider Selling Defendants Sold Substantial Shares of GTT Stock While in Possession of Material, Adverse, Information Regarding the Company's Business***

108.    During the Relevant Period, certain of the Individual Defendants—specifically, the Insider Selling Defendants—engaged in numerous sales of GTT common stock while in possession of material information that was adverse to GTT's business.

109.    While the price of GTT stock was artificially inflated and defendant Calder was in possession of material, adverse nonpublic information, he sold 55,923 shares of personally held GTT stock at artificially inflated prices for proceeds of $2,369,653.

110.    While the price of GTT stock was artificially inflated and defendant McKee was in possession of material, adverse nonpublic information, he sold 60,483 shares of personally held GTT stock at artificially inflated prices for proceeds of $2,602,813.

111.    While the price of GTT stock was artificially inflated and defendant Sicoli was in possession of material, adverse nonpublic information, she sold 13,298 shares of personally held GTT stock at artificially inflated prices for proceeds of $413,514.

112.    While the price of GTT stock was artificially inflated and defendant Bruno was in possession of material, adverse nonpublic information, he sold 3,000 shares of personally held GTT stock at artificially inflated prices for proceeds of $159,119.

113.    While the price of GTT stock was artificially inflated and defendant Janzen was in possession of material, adverse nonpublic information, he sold 19,000 shares of personally held GTT stock at artificially inflated prices for proceeds of $672,180.

114.    In making the insider trades, the Insider Selling Defendants were able to unjustly profit from artificially high trading levels stemming from the Individual Defendants' concerted false and misleading statements disseminated to the market.

## DAMAGES TO THE COMPANY

115.    As a result of the Individual Defendants' wrongful conduct, GTT disseminated false and misleading statements and omitted material information to make such statements not false and misleading when made.  The improper statements have devastated GTT's credibility. GTT has been, and will continue to be, severely damaged and injured by the Individual Defendants' misconduct.

116.    Furthermore, aside from ruining the Company's reputation for honesty, integrity, and aptitude, the Individual Defendants have exposed the Company to very expensive legal costs to defend, investigate, and pay judgment or settlement in the Securities Class Action.

117.    As a direct and proximate result of the Individual Defendants' actions as alleged above, GTT's market capitalization has been substantially damaged, losing millions of dollars in value as a result of the conduct described herein.

118.    Moreover, these actions have irreparably damaged GTT's corporate image and goodwill.  For at least the foreseeable future, GTT will suffer from what is known as the "liar's discount," a term applied to the stocks of companies who have been implicated in illegal behavior and have misled the investing public, such that GTT's ability to raise equity capital or debt on favorable terms in the future is now impaired.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

119.    Plaintiff incorporates the allegations herein by reference.

120.    Plaintiff brings this action derivatively in the right and for the benefit of the Company to redress the Individual Defendants' breaches of fiduciary duties and other violations of the law.

121.    Plaintiff is a stockholder of GTT, were stockholders of GTT at the time of the wrongdoing alleged herein, and have been stockholders of GTT continuously since that time.

122.     Plaintiff will adequately and fairly represent the interests of the Company and its stockholders in enforcing and prosecuting its rights.

123.     As a result of the facts set forth herein, Plaintiff has not made any demand on the GTT Board to institute this action against the Individual Defendants.  Such a demand would be a futile and useless act because the Board is incapable of making an independent and disinterested decision to institute and vigorously prosecute this action.

124.     At the time of the filing of this complaint, the GTT Board consists of the following eight individuals:  defendants Thompson, Calder, Janzen, Bruno, Hackman, Smith, Adamo, Satin, and Erving and non-defendant Stein.

125.     As a result of the facts set forth herein, Plaintiff has not made any demand on the GTT Board to institute this action against the Individual Defendants, the Wanda Defendants, and the Silver Lake Defendants.  Such a demand would have been a futile and useless act with respect to each and every one of the current members of the Board because they are incapable of making an independent and disinterested decision to institute and vigorously prosecute this action.

### _Demand Is Futile as to All Director Defendants Because They Each Face a Substantial Likelihood of Liability_

126.     The Individual Defendants all face a substantial likelihood of liability for their individual misconduct.  The Director Defendants were directors throughout the time of the false and misleading statements, and as such had a fiduciary duty to ensure that the Company's SEC filings, press releases, and other public statements and presentations on behalf of the Company concerning its business, operations, prospects, internal controls, and financial statements were accurate.

127.     Moreover, as directors, the Director Defendants owed a duty to, in good faith and with due diligence, exercise reasonable inquiry, oversight, and supervision to ensure that the

Company's internal controls were sufficiently robust and effective (and were being implemented effectively), and to ensure that the Board's duties were being discharged in good faith and with the required diligence and due care.  Instead, the Director Defendants knowingly and/or recklessly allowed, made or authorized false and misleading statements, failed to timely correct such statements, failed to take necessary and appropriate steps to ensure that the Company's internal controls were sufficiently robust and effective (and were being implemented effectively), and failed to take necessary and appropriate steps to ensure that the Board's duties were being discharged in good faith and with the required diligence.  These actions constitute breaches of the fiduciary duties of loyalty and good faith, for which the Individual Defendants face a substantial likelihood of liability.  If the Director Defendants were to bring a suit on behalf of GTT to recover damages sustained as a result of this misconduct, they would expose themselves to significant liability.  This is something they will not do.  For this reason, demand is futile as to the Individual Defendants.

128.    Further, defendant Calder is incapable of considering a demand to commence and vigorously prosecute this action because he faces additional substantial likelihood of liability as he is a named defendant in the Securities Class Action.  Additionally, defendant Calder is not independent because his principal income comes from his employment with GTT.  In 2018 alone, defendant Calder received $9,160,743 from the Company in compensation.

***Demand Is Excused as to the Audit Committee Defendants Because as Members of the Audit Committee They Face a Substantial Likelihood of Liability***

129.    As members of the Audit Committee during the Relevant Period, the Audit Committee Defendants participated in and knowingly approved filing of false financial statements and allowed the Individual Defendants to repeatedly make other false and misleading statements to the investing public.  More specifically, as members of the Audit Committee, the Audit

Committee Defendants were obligated to oversee and monitor (a) the integrity of the Company's financial statements, and (b) the Company's compliance with legal and regulatory requirements. Instead, the Audit Committee Defendants, as members of the Audit Committee, failed to ensure the integrity of the Company's financial statements and financial reporting process, the Company's systems of internal accounting and financial controls and compliance with legal and regulatory requirements, as required by the Audit Committee Charter.  For this reason, demand is futile as to the Audit Committee Defendants.

### *Demand is Excused as to Defendants Thompson, Calder, Erving, Janzen, Bruno, and Hackman Because of Their Overlapping Business Affiliations*

130.    Defendants Thompson, Calder, Erving, Janzen, Bruno, and Hackman have long-standing professional and personal ties with each other.  Due to their close relationships, and conflicts of interests arising therefrom, defendants Thompson, Calder, Erving, Janzen, Bruno, and Hackman cannot take the necessary and proper steps to investigate and remedy the Individual Defendants' wrongdoing.  Defendants Thompson, Calder, Erving, Janzen, Bruno, and Hackman are incapable of independently and impartially consider a demand to commence and vigorously prosecute this action.

131.    First, defendants Thompson and Erving worked together at LCI International Inc. where Thompson served as Chairman and CEO and Erving served as a director of the company's board.  Second, defendants Calder and Thompson worked together at MCI Communications Corporation.  Third, defendants Thompson and Janzen served on the board of Sonus Networks together.  Fourth, defendants Bruno and Hackman worked together at PricewaterhouseCoopers.

132.    Due to their long-standing professional and personal ties with each other defendants Thompson, Calder, Erving, Janzen, Bruno, and Hackman are incapable of impartially considering

a demand to commence and vigorously prosecute this action, and, thus, the demand upon them is excused.

## CAUSES OF ACTION

### COUNT I
#### VIOLATION OF SECTION 14(A) OF THE EXCHANGE ACT
#### (Against the Individual Defendants)

133.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

134.    The section 14(a) Exchange Act claims alleged herein are based solely on negligence.  They are not based on any allegation of reckless or knowing conduct by or on behalf of the Individual Defendants.  The section 14(a) Exchange Act claims detailed herein do not allege and do not sound in fraud.  Plaintiff specifically disclaims any allegation of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to the nonfraud claims.

135.    The Individual Defendants negligently issued, caused to be issued, and participated in the issuance of materially misleading written statements to stockholders which were contained in the 2018 and 2019 Proxies.  In the 2018 and 2019 Proxies, the Board solicited stockholder votes to reelect certain of the Director Defendants to the Board.

136.    The 2018 and 2019 Proxies, however, misrepresented and failed to disclose, among others, the Board's risk oversight and the Company's inadequate internal controls which facilitated the illegal behavior described herein.  By reasons of the conduct alleged herein, the Individual Defendants violated section 14(a) of the Exchange Act.  As a direct and proximate result of these defendants' wrongful conduct, GTT misled and deceived its stockholders by making materially misleading statements that were essential links in stockholders following the Company's recommendation and voting to reelect the Director Defendants the Board.

137.    Plaintiff, on behalf of GTT, thereby seeks relief for damages inflicted upon the Company based upon the misleading the 2018 and 2019 Proxies in connection with the improper reelection of the Director Defendants to the Board.

## COUNT II
### BREACH OF FIDUCIARY DUTY
### (Against the Individual Defendants)

138.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

139.    Each of the Individual Defendants owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of GTT's business and affairs.

140.    Each of the Individual Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

141.    The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein.   The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of GTT.

142.    In breach of their fiduciary duties, the Individual Defendants failed to maintain an adequate system of oversight, disclosure controls and procedures, and internal controls.

143.    In addition, the Individual Defendants further breached their fiduciary duties owed to GTT by willfully or recklessly making and/or causing the Company to make false and misleading statements and omissions of material fact that failed to disclose, *inter alia*, to investors that the integration of Interoute was not progressing as:  (i) there were delays in migrating Interoute's legacy systems and processes into GTT's client management database system; (2) Interoute had made a strategic priority shift to sell cloud services that was a higher percentage of

Interoute's sales in the two years leading up to the acquisition; (3) a material percentage of the Interoute sales representatives were not productive at selling GTT's core cloud networking services; (4) GTT was unable to yield as many Interoute salespeople because Interoute had hired many sales people focused on cloud services and allowed underperforming sales representatives to remain at Interoute; and (5) as a result of the foregoing, Defendants' public statements were materially false and/or misleading and/or lacked a reasonable basis.

144.     As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

145.     The Individual Defendants failed to correct and caused the Company to fail to rectify any of the wrongs described herein or correct the false and misleading statements and omissions of material fact referenced herein, rendering them personally liable to the Company for breaching their fiduciary duties.

146.     The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent scheme set forth herein and to fail to maintain adequate internal controls.  The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent scheme set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent scheme and to fail to maintain adequate internal controls, even though such facts were available to them.  The Individual Defendants, in good faith, should have taken appropriate action to correct the schemes alleged herein and to prevent them from continuing to occur.

147.     These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

148.    As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, GTT has sustained and continues to sustain significant damages.  As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

149.    Plaintiff on behalf of GTT has no adequate remedy at law.

## COUNT III
### WASTE OF CORPORATE ASSETS
### (Against Individual Defendants)

150.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

151.    As a result of the Individual Defendants' failure to implement adequate internal controls to ensure that the Company's SEC filings and other public statements were not misleading, GTT is subject to the Securities Class Action.  The Individual Defendants have caused GTT to waste its corporate assets by forcing the Company to expend valuable resources in defending itself in the ongoing litigation, in addition to any ensuing costs from a potential settlement or adverse judgment.

152.    As a result of this waste of corporate assets, the Company has been damaged and the Individual Defendants are each liable to the Company.

## COUNT IV
### INSIDER SELLING AND MISAPPROPRIATION OF INFORMATION
### (Against the Insider Selling Defendants)

153.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

154.    At the time each of the Insider Selling Defendants sold his or her GTT stock, he or she knew the material, non-public information described above, and sold GTT stock on the basis of such information.

155.    The information described above was proprietary, non-public information concerning the Company's business operations, financial condition, and growth prospects.  It was a proprietary asset belonging to the Company, which each of the Insider Selling Defendants misappropriated to his or her own benefit when he or she sold personal holdings in GTT stock. Each of the Insider Selling Defendants knew that this information was not intended to be available to the public.  Had such information been generally available to the public, it would have significantly reduced the market price of GTT stock.

156.    The Insider Selling Defendants' sale of stock while in possession and control of this material, adverse, non-public information was a breach of his or her fiduciary duties of loyalty and good faith.  Each of the Insider Selling Defendants is therefore liable to GTT for insider trading.

157.    Since the use of the Company's proprietary information for personal gain constituted a breach of the fiduciary duties of the Insider Selling Defendants, the Company is entitled to the imposition of a constructive trust on any profits such Insider Selling Defendants obtained thereby.

158.    Plaintiff, on behalf of GTT, has no adequate remedy at law.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff demands judgment as follows:

A.    Declaring that Plaintiff may maintain this derivative action on behalf of GTT and that Plaintiff is a proper and adequate representative of the Company;

B.    Awarding the amount of damages sustained by the Company as a result of the Individual Defendants' breaches of fiduciary duties and violations of the federal securities laws;

C.      Granting appropriate equitable relief to remedy Individual Defendants' breaches of fiduciary duties and other violations of law;

D.      Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees and costs and expenses; and

E.      Granting such other and further relief as the Court deems just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated: October 16, 2019                             Respectfully Submitted,

                                                    **COOCH AND TAYLOR, P.A.**

                                                    */s/ Blake A. Bennett*
                                                    Blake A. Bennett (#5133)
                                                    The Nemours Building
                                                    1007 N. Orange Street, Suite 1120
                                                    Wilmington, DE 19801
                                                    Telephone: (302) 984-3800
                                                    Email: bbennett@coochtaylor.com

                                                    *Attorney for Plaintiff*


**OF COUNSEL**

**BRAGAR EAGEL & SQUIRE, P.C.**
W. Scott Holleman
Marion C. Passmore
Garam Choe
Alexandra B. Raymond
885 Third Avenue, Suite 3040
New York, New York 10022
Telephone: (212) 355-4648

*Attorneys for Plaintiff*